Larry Steele for the appellants. Counselor, if you'll pull that mic a little closer to you, I think we'll be able to hear you a little better. Okay. I have hearing aids, and so I tend to speak a little bit low. If I get too loud, you just tell me. I represent Mary Louise Smith and Tiffany E. Smith, and they are mother and daughter, black women. Tiffany is the adult daughter of Mary Smith. Together they had approximately six children in their home. One was the biological daughter of Tiffany Smith, and as I said, Tiffany is the biological daughter of Mary Smith. If one is familiar with the Golden Girls, the character named Maude was a very outspoken white woman, stood her ground, and didn't let anybody push her around. Well, Mary Smith has that personality. She's very honest. Both of these ladies had master's degrees in child-related areas. Both were employed in child-related fields. Tiffany worked for the Department of Human Services, and Mary worked for a corporation, a non-profit corporation in Mississippi County, teaching children. Mary Smith was a foster parent of four children who had disabilities, and who were getting counseling from Families, Inc. in Mississippi County, and they were given or prescribed medications. One of the children, D.W., was an acknowledged self-mutilator, among other problems. He was one of these children that would harm himself from time to time. Well, Mary had given the medications to one of the children to take to school and give to the principal and the nurse, which they did. Explicitly, from time to time, D.W.'s medication would come up one or two pills short, with no explanation. And the doctor from Families, Inc. advised Mrs. Smith to go to the police the next time the medication disappeared. So she, instead of going to the police, she just complained to the principal and the nurse, and to deflect blame from themselves, the nurse and the principal filed a complaint with Crimes Against Children, which is an organization or a department of the Arkansas State Police. And they did this three times, and three times the complaints were found not founded, not credible. And I'm going into the facts, because you have to understand the facts to understand the case. The nurse, when they couldn't get anybody to investigate it, complained to her husband, who happened to be a detective on the Osceola Police Department. Now, was this related to the medication allegation, or was this related to the marks on the child? And this is an important fact, that we didn't learn this. She didn't learn it until two years later, when D.W. told her. D.W. complained to the nurse that Mary was whipping him with a USB cord. Now, what we learned, the nurse and the principal educated D.W. to make this complaint. The fact is, he was injuring himself on a spring on a trampoline. And I'm going to try to get to the heart of this matter. The nurse got her husband to investigate, and by the way, the nurse's husband was black. But he was very, very proficient, and I went into how police tactics can get an innocent person to confess. And he interviewed Mary, and he says he got a confession out of her. I have listened and watched the video, and when he says she said she whipped him with a cord, I thought she said, uh-uh. But according to the investigator, she said, uh-huh. Well... Counsel, I'm going to ask about the licks. She mentioned, I think to the police, something about she admitted to giving him his licks. D.W. got his licks. Is that incorrect? No, she did admit to giving him licks, but it was with her hand. She used her hand on his rear end. That's what she's talking about. She says she never, never admitted using a USB cord. However, the nurse's husband, the detective on the police force, alleged she did. And he gave an affidavit to that effect. To make a long story short, between the detective and Cha Pecka, who was with the Arkansas State Police, Crimes Against Children, the two black women were charged with two felonies of assault, abusing children. Well, does it matter whether it was a USB cord or whether it was the hand? We already know D.W. had marks on his body, I mean, potentially from self-mutilation. But wouldn't a combination of those things provide at least arguable probable cause that Mary was abusing D.W.? Well, there is a difference between a paddling on the rear end and a USB cord. And the spring on the trampoline, the little hook on it, matches perfectly the USB cord. Now, here's the key to your answer to your question. The children were removed from their care. They lost their jobs, obviously, lost everything they had. Tiffany ended up working at a factory. But a year and a half later, after D.W. is in foster care, he's been in foster care a year and a half, this has been eating on him, and he confessed to his foster parents, he made it up. He made the whole story up that he injured himself. He and his brother injured themselves on the trampoline. How does that change the fact that he confesses to having contrived the stories of his injuries? How does that change the evaluation of the defendants here at the time they were believing what he had to say? Well, that proves that the investigating officer's affidavit was false. Now, you can argue that even if Mary admitted to it, if you read my brief on how an investigator that knows what he's doing can get an innocent person and who is naive to come under their psychological control, if you remember Patty Hearst, who was kidnapped in Berkeley, California, and after spending some time with her captors, she helped them rob a bank with a Thompson machine gun. She had come under their control. Well, the same thing happened here if she did indeed confess. We contend she never confessed. But you're ignoring D.W.'s statement. Sir? You're ignoring D.W.'s statement at the time. Well, he didn't make the statement until two years later, and based on his statement, he told the state police investigator the same thing. All the charges were dismissed. But at the time, he was saying that your clients inflicted the injuries on him. I'm sorry, sir? At the time, D.W. was telling the officers that your clients inflicted the injuries. Yes. Yes, originally. And that's what got the investigation started. But you've got to understand. But I think Chief Judge Smith's point was doesn't that provide arguable probable cause? Sure. And I want to say one thing, and then I'm going to say the rest of my time. The district court gave me a gift when he dismissed my case. The lower court candidly stated in their order, quote, where some material fact was genuinely disputed, the court took that fact in the light most favorable to dismiss. And I cited the Eighth Circuit case where an issue of fact exists, the appellees lose their qualified and official immunity. And that's Wheelock v. Brooks. Okay. If the court please, I'd like to save the rest of my time. Thank you, Mr. Steele. We have a series of counsel for the various defendants. I believe we begin with Ms. Worsham for the school district. May it please the court. I'm Rebecca Worsham, and I represent the Osceola School District defendants. I'll be using five minutes of the time allocated among the appellees. This court should affirm the district court's grant, a summary judgment, to the school district defendants on the grounds of qualified immunity because each action taken by school officials was objectively reasonable, and the undisputed material facts support this. The school officials' duties were taken pursuant. The reports to the hotline were taken pursuant to their duties as mandated reporters under the Arkansas Child Maltreatment Act. The appellant's brief doesn't even cite this or address how school officials did not take actions pursuant to their mandatory reporting duties. As this court has held, in order to survive at the summary judgment phase, a party has to bring forth more evidence other than their bare assertions. This court has stated that a party must substantiate her allegations with sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy. And in this entire case, an appeal is based upon nothing but the appellant's naked assertions and speculation. The first naked assertion made by the appellant is that there were some sort of missing medications and that Dee Wallace's first report to the hotline in March 2016 was due because she was trying to deflect from potential criminal charges over D.W.'s missing medication. There's no evidence in the record to support that at all, other than Mary's testimony. Mary didn't even file a police report over the so-called missing medications. And the district court properly described the medication dispute as a dust-up because it's simply not relevant in deciding the legal issues of this case, and that is whether any school official's actions in reporting Smith's to the hotline was objectively reasonable. Because in regards to the medications, undisputed facts show that at the time Dee Wallace made the report, that the school was out of D.W.'s medication, that D.W. continued having behavior issues, that Mary Smith began giving the child medication at home, but she admits in her deposition she didn't tell school officials. Is there anything in the record to indicate why the initial report to the hotline, why those weren't responded to and it necessitated? In regards to the... March. Well, the March order, the March report regarding the medications. Not March, but the... The April, the abuse allegation. Right. There's... And when Nurse Hodges was interviewed by Lieutenant Weber in that investigation, I believe that's on the record at supplemental appellate 3 or 91, when she was interviewed she stated that she had contacted Investigator Chalopeca to say what's going on. She was told that DHS was supposed to send somebody out. Investigator Chalopeca was unsure what happened. She apologized, and that's where it went. And Investigator Steele wasn't there or didn't come out, and so that was when Ashley Smith, or excuse me, Ashley Hodges, contacted her husband with the police department and sent him the photos. In regards to the second assertion... Did DHS ever undertake its own investigation? Yes, it did, after that. Yes, there was a separate investigation. There's the criminal investigation, and then DHS also instigated or started its separate investigation, and it was ultimately found by an administrative law judge that Mary Smith did abuse these children. Or not JM, excuse me, abuse DW. And I'll just wrap this up because I've got one minute left. The school officials are entitled to qualified immunity. They are also statutory immunity under the Arkansas Child Maltreatment Act. Their acts were reasonable. The Smiths provided no evidence to support their assertion that there was bad faith or malice. They provided no evidence of discriminatory animus against the Smiths on the basis of their race. And this court should affirm the lower court's judgment and grant the school officials qualified immunity. If there are any questions, I'll answer. I see none. Thank you, Ms. Worsham. Thank you. Ms. Lefevre. Good morning, Your Honors, and may it please the Court. My name is Amanda Lefevre, and I am here on behalf of Separate Appellees, the City of Osceola, Terry Hodges, Michael Gonzalez, and Dakota Duncan, to whom I will refer to collectively as the City Appellees and or the City Defendants. This court should affirm the grant of qualified immunity and summary judgment to the various City Appellees because the district court correctly determined that arguable probable cause existed for each of Mary Smith's and Tiffany Smith's arrests, and the grant of qualified immunity to each of the individual defendants was proper. And because the grant of qualified immunity was proper to the individual defendants, the grant of summary judgment was proper to the City Defendant, the City of Osceola itself. What triggered the arrest based on, I suppose, the belief that there was a protection order? Is that involved? Yes, Your Honor, there were multiple arrests of Mary Smith and Tiffany Smith. What triggered the arrest for the order, or I guess the final arrest at issue in the case of Mary Smith was that prior to her arrest, Ms. Smith had gone to one of the local elementary schools to visit one of the minor children. And in doing so, the school official was aware that there were orders of protection in place with respect to Ms. Smith. It had been months earlier, correct? Correct, Your Honor, but there was not one, not two, but three different no contact and orders of protection in place with respect to Mary Smith, one of which was as broad as no contact with any minor children. Did it turn out that those were in effect, were still in effect? Yes, Your Honor, there is zero record evidence that any of the three separate no contact orders have been revoked, rescinded, set aside, expired under their own terms. As far as I'm aware, they are still in effect today. I've not seen any document or order that the one entered by Judge Betterton, the one entered by Judge Thayer, the one entered, I think a second one by Judge Betterton. Did the police investigate themselves to determine if there were actually protection orders and whether or not they were in place? Is there anything in the record to indicate? Subsequent to the arrest, Your Honor, no there is not. Before? Before, so the detective did confirm that the order of protection was still in place, Detective Terry Hodges, when he drafted his affidavit for the warrant. And then the officers who served the warrant, the initial officer who attempted to serve the warrant was Sam Pollock, a former Osceola police officer. He's no longer a party to the case. He was dismissed pursuant to a motion to dismiss for failure to serve. He was unable to serve the warrant and so he asked for some, because Ms. Smith slammed the door in his face, he contacted his supervisor, Sergeant Pollock, who arrived with Officer Dakota Duncan. Sergeant Gonzalez contacted Detective Hodges and confirmed that the warrant was still valid and active. I believe that the appellant's argument is that prior to serving that valid arrest warrant at that point in time, they should have contacted all of these judges and conducted a full-blown investigation, which as we know under QLV Burtis, 173 F3D 646, 8th, 1999, is simply not required. There's just no... But the warrant affidavit represented that an investigation had been done to determine if no contact orders were enforced? Yes, Your Honor. The Detective Hodges, prior to swearing out the affidavit, had confirmed that the no contact order was still in place. And as I said, subsequent to that, there's no record evidence that any of those orders were revoked or rescinded or set aside. And so, at this point, the appellant must meet proof with proof. And he has not done so. He's not carried that burden. And as appellant admitted on the record, I think just five and a half minutes ago, arguable probable cause existed for each of these arrests. So were prosecutions undertaken based on those arrests? Yes, Your Honor. I believe that all of the charges were ultimately null-prossed. It did take some time to prosecute those. And I think based in large part on the minor child's recantation of the abuse allegations, the charges were ultimately null-prossed. I'm out of time. I'm happy to answer any further questions. But at this time, City Appellees respectfully request that this Court affirm the grant of qualified immunity and summary judgment to the City Appellees. Thank you, Ms. LaFever. Thank you, Your Honor. Ms. Jackson. Thank you, Your Honor. My name is Marina Jackson. I represent State Appellees, Department of Human Services, Asa Hutchinson, Cindy Gillespie, William Bryan, Jeffrey Drew, Sylvia Wehrer, and Catherine Chalpeca. The District Court correctly granted State Appellees' motions to dismiss based on the facts alleged in the plaintiff's amended complaint. Arkansas Department of Human Services' Gillespie, Bryan, and Hutchinson were sued only in their official capacity. The amended complaint lacked any factual allegations against the state defendants. Therefore, the District Court looked at the language of the amended complaint and granted their motion to dismiss. The District Court also correctly dismissed individual capacity claims against State Appellees' Drew, Chalpeca, and Wehrer. Rule 8 of Federal Rules of Sale Procedure requires that a complaint must contain a short and plain statement of the claim, showing that the pleader is entitled to relief. In this situation, Asa Hutchinson was named once in the complaint in the heading there was no factual allegations against DHS of Cindy Gillespie or William Bryan or Jeffrey Drew. The amended complaint stated that Sylvia Wehrer was named in the lawsuit because she was a supervisor at DHS and due to her overt encouragement of the prosecution of Smith. Respectfully, this was not sufficient to state any factual allegation to support any cause of action against this defendant. The District Court also correctly found that Smith's individual capacity claims against Wehrer and Chalpeca are barred under the doctrine of qualified immunity. I will point the Court to the language that Judge Marshall put in his order, and he stated that the amended complaint itself demonstrated that Chalpeca is entitled to qualified immunity on Smith's federal claim. A school nurse had photographs of possible injuries to a child, and a police officer said that both the child and Smith confirmed the abuse. There were only allegations of a conclusive conspiracy claim. There was absolutely no allegation that Chalpeca knew or had any reason to know that any of that information was false. Nor was there any allegation in the amended complaint that Chalpeca or any of the state defendants or police lied about the injuries to the second child. Therefore, the District Court correctly granted qualified immunity to state police and dismissed them from this lawsuit. Now, after state police were dismissed from this lawsuit, this was litigated for over a year, and the summary judgment was granted, and the whole case was dismissed with prejudice. We ask that this Court affirm the decision of the District Court dismissing state defendants. Thank you very much. Thank you, Ms. Jackson. Mr. Thompson? Mr. Thompson? May it please the Court, my name is Robert Thompson. I represent Families Incorporated. The procedural posture of this case is that the District Court dismissed the claims raised against my client. Pursuant to Rule 12b-6, I respectfully request this Court to affirm the dismissal for failure to state a claim against Families Incorporated. Families Incorporated is different than the other three groups of defendants in this case in that we are a private party. Families Incorporated is a private Arkansas corporation that provides school-based services in public schools in North Arkansas and Central Arkansas. The complaint barely mentions Families Incorporated. Families is only mentioned in passing in paragraph 16 of the first admitted complaint, which is on page 5 of the appendix. And then on page 10 of the appendix, in paragraph 57 of the complaint, Families Incorporated is mentioned again. I'll read the very brief allegations. It says that Families has made a defendant because the supervisor, Ms. Bost, hid therapy records, obstruction of justice of one or more minors, making allegations against the plaintiffs, Mary Smith and Tiffany Smith. There are insufficient allegations that Families Incorporated was a state actor, acted under color of law, and there are insufficient allegations that Families engaged in any misbehavior that would give rise to any of the tort claims. So I would respectfully request that this Court affirm the dismissal of my client. Thank you. Thank you, Mr. Thompson. Mr. Steele, your rebuttal. Thank you. First, Your Honor, the complaint alleges a conspiracy, which means that the acts of one is attributed to the other. Now, to answer the question about the no contact order, the school called Mary and asked her to come to the school and view the children. One of the school personnel did that. Then they ended up filing charges against her. To answer the question, she showed the police officer's paperwork that she had some of the children returned to her custody already. They were there in the room when the police made the arrest. And the police called, who did they call? Terry Hodges. They wanted to wait until the next day to clarify all of this. But Terry Hodges said, pick her up, pick her up. Now, the original arrest for the felony was triggered by the affidavit of Terry Hodges. But for Terry Hodges, they would not have been arrested. And you've got to remember, Terry Hodges is the husband of Nurse Hodges, who had this vendetta because she couldn't get DHS to do anything. Chalpeca, she is with the Arkansas State Police, but she is not a qualified police officer. But she is with the state police, and she works so closely with Osceola Police Department. She had an office in one of their police, in one of their offices. They were just like this. And she knew that this complaint was coming down. She had already heard about it. But what you've got to understand, everybody had been made aware of the complaint that Dee Wallace sent to the Arkansas State Police originally. And that's in my brief. And she was admitted that D.W. was a self-mutilator. And Children's Inc. is made a defendant because they had all the paperwork on D.W. But when this investigation started, they found a hole to hide in. And could have exonerated Mary with these whips on his leg. Because this kid being a self-mutilator, they should have raised questions and investigated it further. In fact, Mary tried to explain to anybody that would listen that they did it on the trampoline. But nobody would listen. She even showed the spring. And there's a picture in the file of the spring and the injuries. Well, the thing about it is, again, it was a conspiracy. And if anybody knows anything about conspiracies, you don't have to say, are you with me? You can have a lynch mob and it's a conspiracy whether they've talked about it or not. But anyway, my time's about up. And I appreciate the opportunity. Thank you. Thank you, Mr. Steele. Thank you also, counsel, for the appellees. Court appreciates all counsel's participation and argument this morning. We will take the case under advisement.